**SO ORDERED.**

**SIGNED this 13 day of February, 2017.**



_____
**David M. Warren
United States Bankruptcy Judge**

_____

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NORTH CAROLINA
WILMINGTON DIVISION

| | |
|---|---|
| IN RE: | CASE NO. 16-00859-5-DMW |
| ASHLEY T. WALLACE<br>SARA J. WALLACE | |
| | CHAPTER 11 |
| DEBTORS | |

**ORDER DENYING CONFIRMATION OF CHAPTER 11 PLAN**

This matter comes on to be heard upon the Amended Plan of Reorganization ("Amended Plan") filed by Ashley T. Wallace ("Mr. Wallace") and Sara J. Wallace ("Ms. Wallace") on October 25, 2016.  The court conducted a hearing ("Initial Hearing") in Raleigh, North Carolina on December 15, 2016, at the conclusion of which the court ordered that the Initial Hearing be adjourned to allow Mr. Wallace and Ms. Wallace (collectively "Debtors") the opportunity to investigate income producing options for their vacation home ("Mountain Property") located at 998 Beech Mountain Parkway, Banner Elk, North Carolina.  The court conducted a second hearing ("Second Hearing") in Raleigh, North Carolina on January 26, 2017.  Jonathan E. Friesen, Esq. appeared for the Debtors, Brian C. Behr, Esq. appeared for the United States Bankruptcy Administrator ("BA"), and Jill C. Walters, Esq. appeared for Bank of the Ozarks ("BOTO").

Based upon the pleadings, the testimony and evidence presented at the Initial Hearing and Second Hearing, the arguments of counsel and the case record, the court makes the following findings of fact and conclusions of law:

Background

1.  The Debtors filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code ("Code") on February 19, 2016.

2.  On Schedule A/B filed with the court, the Debtors listed real property ("Residence") located at 10299 Croft Point Lane, Leland, North Carolina which serves as their residence. The Debtors assert the value of the Residence to be $335,000.00 based on a September, 2015 appraisal but acknowledge that the tax value is $453,550.00.

3.  The Debtors also listed the Mountain Property on Schedule A/B. The Debtors used cash to purchase the Mountain Property as an "investment" on March 15, 2012, and that property remains unencumbered. The Debtors use this "investment" as a vacation home and occasionally donate its use to churches. The Debtors assert the Mountain Property has a value of $155,000.00. The tax value of the Mountain Property is $209,000.00.

4.  The Residence is encumbered by a first priority deed of trust in favor of Wells Fargo Bank, N.A. ("Wells Fargo"). Wells Fargo filed a proof of claim in the amount of $364,181.89 on June 21, 2016. The Residence is encumbered by a second priority deed of trust in favor of BOTO. BOTO filed a proof of claim in the amount of $250,468.85 on March 9, 2016.

5.  The Debtors filed a Disclosure Statement on May 19, 2016 pursuant to 11 U.S.C. § 1125(b). The Debtors attached to the Disclosure Statement as Exhibit B, a list of the Debtors' liabilities, including $404,311.36 in unsecured debt held by the Debtors' unsecured creditors ("Unsecured Creditors"). The Debtors included BOTO in the list of Unsecured Creditors based

2

upon the asserted value of the Residence.  According to the Debtors, BOTO is unsecured pursuant to 11 U.S.C. § 506(a)(1), because the value of the Residence is less than the balance owed under the Wells Fargo secured indebtedness.  BOTO's claim constitutes nearly 62% of the general unsecured class.

6. Exhibit C attached to the Disclosure Statement is a liquidation analysis ("Liquidation Analysis") projecting what the Unsecured Creditors would receive if the case were converted to one under Chapter 7.  The Liquidation Analysis estimates that the Unsecured Creditors would receive $96,166.96 if the Debtors' assets were liquidated in a Chapter 7.

7. The Debtors propose through the Amended Plan to pay the amount of $155,000.00 to the Unsecured Creditors.  This amount would result in an approximately 38% dividend to the Unsecured Creditors.[1]  The proposed payment to the Unsecured Creditors is based on the asserted $155,000.00 value of the Mountain Property.  BOTO was substantially involved in the negotiation of this provision of the Amended Plan, as the Debtors originally proposed to pay only $100,000.00 to the Unsecured Creditors based on their Liquidation Analysis.

8. The Debtors propose to execute a promissory note ("Unsecured Creditors Note") in favor of the Unsecured Creditors which would be secured by a deed of trust on the currently unencumbered Mountain Property. The Unsecured Creditors Note would be amortized[2] over a 15 year period with a five-year balloon payment, with the Debtors paying quarterly installments of

---

[1] Over $47,000.00 of the Debtors' unsecured debt appears to be in the nature of balances owed on nondischargeable educational loans.  The dividend to the creditors on those loans would not be limited to 38%, because under the terms of the Amended Plan, "the Debtors [would] resume regular payments of such educational loans that are non-dischargeable under 11 U.S.C. § 523" upon payment to the Unsecured Creditors pursuant to the Amended Plan.

[2] The Unsecured Creditors Note would accrue interest at the federal post-judgment interest rate in effect on the Effective Date of the Amended Plan.  The payments to the Unsecured Creditors would be made by a third-party disbursement agent that would deduct a disbursement fee from the quarterly installments made pursuant to the Unsecured Creditors Note.

3

approximately $2,584.32. At the end of the five years, the Debtors would have either to refinance the Unsecured Creditors Note or sell the Mountain Property.

9. The Debtors attached to the Amended Plan an appraisal ("Mountain Property Appraisal")[3] conducted by Dan L. Perry of PerryCo Appraisals on September 15, 2015.[4] Mr. Wallace testified at the Second Hearing that the engagement of Mr. Perry was an arm's length transaction, and Mr. Wallace never discussed his opinion of value with Mr. Perry. Mr. Perry utilized the common "sales comparison approach" and compared the Mountain Property with three nearby properties ("Comparison Properties") in finding the value of the Mountain Property to be $155,000.00. The Comparison Properties were sold between January, 2015 and June, 2015, with the later date being almost nineteen months prior to the Second Hearing. Upon examination Mr. Wallace did not have any explanation for the $54,000.00 discrepancy between the value assigned by Mr. Perry and the tax value of the Mountain Property. No one other than Mr. Wallace provided any testimony to support Mr. Perry's uncorroborated written appraisal of the Mountain Property.

10. Unlike many "investment" property owners, the Debtors have never rented the Mountain Property. At the Initial Hearing, Mr. Wallace testified that the Debtors had considered renting the Mountain Property to generate additional income but could not provide any information on that alternative. The court suggested that the Debtors explore renting the Mountain Property after the conclusion of the Initial Hearing.

11. At the Second Hearing, Mr. Wallace stated that after the Initial Hearing, the Debtors contacted four rental agencies in the Banner Elk/Beech Mountain area to obtain information about

---

[3] The Mountain Property Appraisal states the Mountain Property is in Beech Mountain, NC. Schedule A/B filed by the Debtors states the Mountain Property is in the adjacent town of Banner Elk, NC.

[4] Interestingly, the engagement of Mr. Perry was five months prior to the Petition Date.

4

rates and expenses that could be expected if the Debtors rented the Mountain Property for a portion of the winter and summer months.

12. Based upon the information gathered by the Debtors, the Mountain Property could generate income totaling $22,050.00 per year based upon approximately twenty-two rental weeks at an average of $980.00[5] per week. The Debtors tendered to the court an exhibit itemizing projected expenses ("Expenses") that would be associated with the seasonal weekly rental of the Mountain Property, including cleaning fees of $7,168.00 per year as estimated by one of the consulting rental agencies. Certain Expenses represent historical expenses based upon the Debtors' personal, and not commercial, use of the Mountain Property. Those Expenses, which include utilities,[6] *ad valorem* taxes, insurance premiums and $1,550.00 in annual maintenance expenses, total $9,705.00, regardless of whether the asset is leased.

13. The Debtors did not explore year-round rental possibilities for the Mountain Property. Mr. Wallace testified that monthly rental rates in the area are between $800.00 and $900.00 per month but did not provide the court with adjusted expense projections for long-term monthly rentals (*e.g.,* showing reduced cleaning expenses and possibly no utility expenses).

14. According to the Debtors, before the Mountain Property can be rented the Debtors need to complete repairs costing an estimated $8,000.00. The Debtors base this figure on an estimate provided by a repairman and Mr. Wallace's assessment of what it would cost to repair the concrete in the garage of the Mountain Property to allow vehicles to park inside. Factoring in the Expenses and the anticipated repair costs, the Debtors project that during the first year of

---

[5] Mr. Wallace reached this figure by averaging the estimated weekly rental rates during winter ($1,200.00) and summer ($760.00).

[6] Mr. Wallace testified that the amount he labeled as "Actual Data" for electricity costs would be lower if the Mountain Property were not rented, implying that he in fact adjusted upward "actual data" to estimate annual electricity costs with renters, and that perhaps this line item would be lower if the Mountain Property were not rented. Mr. Wallace did not testify that any of the other Expenses marked as "Actual Data" were adjusted in this manner.

seasonally renting the Mountain Property, the Debtors would lose $3,733.00. During the five-year period before the Debtors must pay the Unsecured Creditors in full, the Debtors would spend almost $50,000.00 exclusively for expenses for the Mountain Property. That amount may be mitigated by potential rental income; however, the Debtors are not optimistic that they will be able to rent the Mountain Property. The perception from Mr. Wallace's testimony is that the Debtors are not fully invested in truly treating the Mountain Property as an investment, rather it is a long-distance vacation retreat.[7]

15. The Debtors have not proposed to further amend the Amended Plan to *require* them to rent the Mountain Property. Instead, Mr. Wallace stated that "the next time [he's] up there" he will meet with someone to see if renting the Mountain Property could be profitable.[8] The Debtors did agree that if the Amended Plan were confirmed they would file with their quarterly reports information regarding the rental income, if any, of the Mountain Property, and Mr. Wallace acknowledged that any rental income would be "unanticipated" because the Debtors' current financial projections do not include rental income.

16. Mr. Wallace is the Director of Business Programs at Brunswick Community College, and Ms. Wallace is the owner of Wallace Education Holdings, LLC. The Debtors' income from those two jobs is stable and predictable. Mr. Wallace also owns a company called The Wallaby Group, LLC ("Wallaby") that assists in the sale and acquisition of businesses. Mr. Wallace receives sporadic income from Wallaby whenever closings of sales occur. During the years 2018 through 2021, Mr. Wallace anticipates net income in the amount of $75,000.00 per year from Wallaby based on his income from Wallaby since March, 2013. Mr. Wallace testified

---

[7] Leland, NC is over 300 miles from Banner Elk, NC.
[8] Mr. Wallace testified that he went to the Mountain Property in December after the Initial Hearing, but businesses (presumably rental agencies) were closed, and he was unable to make any additional progress on renting the Mountain Property.

that any income from Wallaby in the years 2018 through 2021 greater than $75,000.00 would be unanticipated.

## Jurisdiction

17.      This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(L), and the court has jurisdiction pursuant to 28 U.S.C. §§ 151, 157, and 1334.

18.      The court has the authority to hear this matter pursuant to the General Order of Reference entered August 3, 1984 by the United States District Court for the Eastern District of North Carolina.

## Discussion

19.      In order to be confirmed by the court, a Chapter 11 plan must be proposed in good faith. 11 U.S.C. § 1129(a)(3). "Although the term 'good faith' is not defined by the Code, courts have generally interpreted it to mean there is a 'reasonable likelihood that the plan will achieve a result consistent with the objectives and purposes of the Bankruptcy Code.'" *In re Osborne*, 2013 Bankr. LEXIS 2203, at *11-12 (Bankr. E.D.N.C. May 30, 2013) (quoting *In re Madison Hotel Assocs.*, 749 F.2d 410, 425 (7th Cir. 1984)).

20.      The court cannot approve of a plan that fails to account sufficiently for asserted real property values that are significantly lower than tax values and allows the Debtors to emerge from bankruptcy with a vacation home after discharging hundreds of thousands of dollars in unsecured debt.[9] Certainly that result is not "consistent with the objectives and purposes of the Bankruptcy Code." *Osborne*, 2013 Bankr. LEXIS at *11-12.

---

[9] The court is unable to ascertain the exact amount of unsecured debt that would be discharged under the Amended Plan because of the significant portion of the Debtors' unsecured debt that is related to nondischargeable educational loans.

7

21. The court is aware that, based on the values of the Residence and Mountain Property as asserted by the Debtors, the Debtors have proposed to pay to the Unsecured Creditors more than they would receive in a Chapter 7 liquidation and above what is required by § 1129(a)(7) of the Code. This treatment would seemingly indicate good faith on the part of the Debtors; however, the insufficient evidence of the property value and the Debtors' hesitancy to use the Mountain Property to generate income along with the accruing expenses negates the adequacy of the Debtors' perceived good faith.

22. The court takes particular issue with the unsubstantiated Mountain Property Appraisal, given that the Debtors base their proposed payment to the Unsecured Creditors on the value of the Mountain Property (after negotiating this provision with BOTO and increasing the proposed amount). Although tax value is not always indicative of a property's market value, the court would expect stronger evidence than what was presented to explain a nearly 26% variation between those two values. Similarly, although no party has contested the Debtors' valuation of the Residence, the court wonders whether the assigned value is accurate. The Debtors should not rely on a stale appraisal, lacking an evidentiary foundation, to support the Mountain Property valuation. If the actual value is, in fact, higher, the Liquidation Analysis would require a higher payout to the Unsecured Creditors, and the proposed payment to those creditors would appear less generous.

23. The court is also disappointed with the lack of progress made between the Initial Hearing and the Second Hearing regarding rental potential for the Mountain Property. The Debtors failed to collect sufficient data to present a reliable rental plan with various options of long-term and short-term rentals. The Debtors could have countered the perceived lack of good faith by proposing a plan amendment requiring the rental of the Mountain Property. They did not. Counsel

for the BA correctly noted that because the Debtors have not included income from the Mountain Property in their financial projections, any income in the future would be unanticipated and may open the door for an interested party to seek modification of a confirmed plan; however, that potential safeguard is insufficient to ensure the Debtors are seeking to repay the Unsecured Creditors in good faith.

24. The Debtors expend at least $9,000.00 annually on the Mountain Property and will continue to spend that amount, regardless of whether it is rented. That expense does not seem to register with Mr. Wallace, but it sure registers with the court. Rental income would reduce those expenses. The Debtors' hesitancy to rent the Mountain Property implies they would rather maintain the Mountain Property for their exclusive benefit, rather than approach the asset as an investment that could return money to the Debtors' creditors.

25. The court recognizes that the Debtors are willing to execute the Unsecured Creditors Note and submit to reporting requirements beyond those outlined in the Code. As a result, the Unsecured Creditors would receive their entire disbursement within five years when the Debtors either refinance the Unsecured Creditors Note or sell the Mountain Property, and Mr. Wallace's future income from Wallaby would be scrutinized to ensure the Debtors' circumstances do not change substantially enough to warrant a modification of the payment terms. Reporting requirements and contingent income place the risk on the creditors, rather than on the Debtors who are seeking relief from this court. The court is unwilling to shift that burden.

26. Under the circumstances of this case, and in light of the repayment provisions as currently proposed by the Debtors, the court cannot find that the Debtors have proposed the Amended Plan (as orally amended at the Second Hearing) in good faith to satisfy the requirement of 11 U.S.C. § 1129(a)(3). Further, the valuations provided by the Debtors do not sufficiently

support a finding that the Amended Plan is in the best interest of creditors under § 1129(a)(7); now therefore,

It is ORDERED, ADJUDGED and DECREED that confirmation of the Amended Plan be, and hereby is, denied without prejudice to the Debtors filing a further amended plan of reorganization consistent with this Opinion.

END OF DOCUMENT